1998 SD 80

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Brian David LARSON, Defendant and Appellant.**

No. 20070.

Supreme Court of South Dakota.

Argued April 27, 1998.

Decided July 15, 1998.

Mark Barnett, Attorney General, Sherri Sundem Wald, Assistant Attorney General, Pierre, for plaintiff and appellee.

David R. Gienapp and Philip R. Parent of Arneson, Issenhuth & Gienapp, Madison, for defendant and appellant.

SABERS, Justice.

[¶ 1.] Brian Larson was convicted of two counts of second degree manslaughter following a motor vehicle accident which killed two highway construction workers. He appeals the denial of his motion for judgment of acquittal. We affirm.

## FACTS

[¶ 2.] On September 16, 1996, a highway construction crew was working in the right lane of eastbound Interstate 90 in Lyman County. The construction area stretched between mile markers 212 and 234 and was separated from the driving lane by "candlestick" dividers. These dividers were generally placed about a foot inside the closed lane, but placed on the center line where the crew was actually working. The highway had a posted speed limit of 75 m.p.h. but a posted recommended speed of 55 m.p.h. through the construction zone.

[¶ 3.] There was expert testimony that Brian Larson was traveling between 62 and 68 m.p.h. when his 1996 Ford Explorer crossed over the center line and drove about one and one-half feet into the closed lane for approximately 101 feet. At this estimated speed, Larson would have traveled that 101 feet in just over one second. In that one second, he struck and killed two construction workers, Julie Smith, age 20, and Brandon Koehn, age 18.

[¶ 4.] Three crew members, Ryan Kotz, Dave Solmonson, and Koehn were breaking up bad concrete with jackhammers near the on-ramp of Exit 214. Once there was an accumulation of chipped concrete, Smith would remove the debris using first an air hose and then a shovel. At about 9:30 a.m., Kotz was working in the first, westernmost cutout area, Solmonson was in the first cutout east of Kotz, and Koehn was in the next cutout, approximately ten to twenty feet east

of Solmonson. Solmonson's cutout became full of debris; he stopped working and went to sit in a company pickup. Smith began cleaning the cutout with an air hose and was standing somewhere between the center line and a point one and one-half feet into the driving lane.

[¶ 5.] Almost immediately after getting into the pickup, Solmonson's attention was caught by dust and debris flying through the air. When he looked up, he saw Smith on the front of the vehicle and Koehn flying off to the right. Kotz testified that he was facing the driving lane as he worked and suddenly realized a vehicle was driving in his cutout. He looked up and to his right and saw the vehicle hit Koehn, knocking him into the air. Solmonson observed Smith as she came out from under the back of the vehicle and into the median. The dent on the Explorer indicates Smith was struck in the approximate center of its hood. Both Smith and Koehn were killed instantly. As noted, the vehicle left the closed lane after 101 feet, crossed the driving lane diagonally, and entered the median. Larson first braked after he entered the median, where he traveled approximately 205 feet before the vehicle came to a stop.

[¶ 6.] At trial, the court allowed two highway patrolmen and Kotz to testify to their opinions that certain tire tracks depicted in photographs were made by Larson's Explorer. The court also admitted, over Larson's objection, two photographs of Smith's body and one of Koehn's body.

[¶ 7.] Larson was convicted of two counts of second degree manslaughter under SDCL 22-16-20:

Any reckless killing of one human being, including an unborn child, by the act or procurement of another which, under the provisions of this chapter, is neither murder nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree. Manslaughter in the second degree is a Class 4 felony.

He received two consecutive 10–year penitentiary sentences.

[¶ 8.] Larson appeals the denial of his motion for judgment of acquittal, arguing:

1) there was insufficient evidence of "recklessness" to support the convictions because his conduct did not rise above mere negligence or inadvertence, and therefore, the trial court should have granted his motion for judgment of acquittal;

2) the trial court erred in allowing the testimony regarding the tire tracks; and

3) the trial court erred in admitting the photographs.

### STANDARD OF REVIEW

[¶ 9.] In reviewing the denial of a motion for judgment of acquittal, the ultimate question is whether the evidence was sufficient to sustain the convictions.

Our standard of review of a denial of a motion for judgment of acquittal is whether State set forth sufficient evidence from which the jury could reasonably find the defendant guilty of the crime charged. *State v. Abdo,* 518 N.W.2d 223, 227 (S.D. 1994); *State v. Gallipo,* 460 N.W.2d 739, 742 (S.D.1990). In determining the sufficiency of the evidence to constitute the crime, the question is "whether there is sufficient evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt; in making this determination, the court will accept the evidence, and the most favorable inference fairly drawn therefrom, which will support the verdict." *State v. Heftel,* 513 N.W.2d 397, 399 (S.D. 1994) (citations omitted).

*State v. Thompson,* 1997 SD 15, ¶ 34, 560 N.W.2d 535, 542–43 (citing *State v. McGill,* 536 N.W.2d 89, 91–92 (S.D.1995)).

[¶ 10.] As for the trial court's evidentiary rulings, they are presumed correct and are reviewed under an abuse of discretion standard. *State v. Goodroad,* 1997 SD 46, ¶ 9, 563 N.W.2d 126, 129 (citing *State v. Oster,* 495 N.W.2d 305, 309 (S.D.1993)). "The test is not whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." *Id.* (citing *State v. Rufener,* 392 N.W.2d 424, 426 (S.D. 1986)).

### [¶ 11.] 1. WHETHER THERE WAS SUFFICIENT EVIDENCE OF "RECKLESSNESS" TO SUPPORT THESE CONVICTIONS.

■ [¶ 12.] Larson claims that his conduct did not constitute "recklessness" under SDCL 22–16–20. "Recklessness" is defined in SDCL 22–1–2(1)(d):

The words "reckless, recklessly" and all derivatives thereof, import a conscious and unjustifiable disregard of a substantial risk that the offender's conduct may cause a certain result or may be of a certain nature. A person is reckless with respect to circumstances when he consciously and unjustifiably disregards a substantial risk that such circumstances may exist[.]

He argues that under *State v. Olsen*, 462 N.W.2d 474 (S.D.1990), his motion for judgment of acquittal should have been granted.

[¶ 13.] Olsen was driving a tractor at a very low speed on a state highway. As he turned left onto a gravel road, he was struck by a car traveling in the opposite direction. The driver of the car was killed instantly. An eyewitness testified that Olsen ran from the tractor exclaiming, "I didn't see it." State charged Olsen with second degree manslaughter, which was dismissed at preliminary hearing after the magistrate determined there was not probable cause to sustain the charge.

■ [¶ 14.] This court affirmed the dismissal, stating, "[r]ecklessness requires more than ordinary negligent conduct. Evidence of carelessness, inadvertence or other similar behavior is insufficient to sustain a conviction where reckless conduct is required." 462 N.W.2d at 476 (citation omitted). The focus is on the state of mind of the individual, and whether his conduct is perceived as negligent or reckless depends upon his awareness of the risk his behavior creates:

As explained in 1 C. Torcia, *Wharton's Criminal Law* § 27, at 140 (1978):

The difference between the terms "recklessly" and "negligently", as usually defined, is one of kind, rather than of degree. Each actor creates a *risk* of harm. The reckless actor is *aware* of the risk and disregards it; the negligent actor is *not aware* of the risk but should have been aware of it.

(Emphasis in original). The same idea is expressed in Treiman, *Recklessness and the Model Penal Code*, 9 Am.J.Crim.L. 281, 351 (1981):

It is the concept of conscious disregard that distinguishes recklessness from negligence. The negligent actor fails to perceive a risk that he ought to perceive. The reckless actor perceives or is conscious of the risk, but disregards it.

*Id.* at 476–77.

[¶ 15.] Larson points to State's comment in closing argument, wherein this accident was characterized as resulting from a "microsecond of recklessness." He argues this cannot constitute the requisite "conscious disregard of a known risk" as required by *Olsen.*

[¶ 16.] State responds that Larson had advance warning of the crew's presence and could have driven on the left shoulder to avoid the accident. State also claims Larson's admission that he was driving faster than he should and his failure to brake until he was out of the construction zone and in the median proves recklessness.[1] Larson counters with the claim that the crew was not wearing bright clothing and that there were no flagpersons present as required by the construction contract and by the Manual on Uniform Traffic Control Devices (MUTCD), which has been adopted by the State of South Dakota. Therefore, he argues that the construction company and State share the blame for this accident, mitigating any "recklessness" on his part.

[¶ 17.] Larson does not claim that he was unaware of the construction zone because of inadequate signage or unaware of the crew's presence because they were not wearing bright clothing.[2] In fact, he saw the crew

---

1. However, State's own expert testified that the reaction time from acceleration to braking is 1.35 to 1.6 seconds, which is longer than the approximate one second Larson drove in the closed lane.

2. The MUTCD is a national publication promulgated by the Federal Highway Administration and is the "national standard for all traffic control devices installed on any street, highway, or bicycle trail open to public travel[.]" See 23

working and was aware that he hit Smith.[3] Larson did not testify at trial; however, in a conversation taped almost immediately after the accident, he told Trooper Storey that the work crew was "kinda far out ... they were pretty close to the line but I was in my lane." He also stated that he was traveling 60 m.p.h. and that he believed the construction zone speed limit was 40 m.p.h.

[¶ 18.] We cannot say, as a matter of law, that Larson's conduct did not constitute recklessness. Here, reasonable minds could certainly differ. Viewing the evidence and the inferences which may be fairly drawn therefrom in the light most favorable to the verdict, we conclude there was sufficient evidence to sustain the jury's finding of guilt beyond a reasonable doubt. *Thompson,* 1997 SD at ¶ 34, 560 N.W.2d at 542–43. Larson argues that driving in excess of the recommended speed limit cannot alone constitute recklessness. *See Olsen,* 462 N.W.2d at 477 ("Criminal responsibility for death resulting from the operation of a motor vehicle in violation of the law will result only if the violation is done in such a manner as to evidence a reckless disregard for the safety of others."). However, Larson's speed of 62 to 68 m.p.h. *in the presence of a visible road construction crew* constitutes a conscious disregard of the safety of the crew. "Awareness can be established if the defendant acts

in a manner that indicates a reckless disregard for the safety of others." *Id.*

[¶ 19.] It is Larson's speed of 62 to 68 m.p.h., maintained despite his admitted awareness of the crew's presence, coupled with his veering into the closed lane, which constitutes recklessness, and which distinguishes this case from *Olsen* and other cases relied upon by Larson. *See id.* ("Nothing in the evidence of Olsen's behavior suggests that he was in any way aware of the risk he was creating when he turned his tractor towards the gravel road."); *State v. Klatt,* 544 N.W.2d 461, 462–63 (Iowa Ct.App.1995) (reversing conviction of vehicular homicide; passing in a no-passing zone does not constitute a conscious disregard of the safety of others when oncoming car was not visible and defendant had "peeked out" several times to assure a clear path to pass); *State v. Cox,* 500 N.W.2d 23, 25–26 (Iowa 1993) (reversing conviction of vehicular homicide; only evidence offered by State to prove recklessness was defendant's failure to stop and yield); *accord Behn v. State,* 621 So.2d 534 (Fla.Dist.Ct.App.1993); *State v. Collins,* 67 Ohio St.3d 115, 616 N.E.2d 224 (1993); *Commonwealth v. Clowser,* 212 Pa.Super. 208, 239 A.2d 870 (1968). All of these cases involve situations where the only evidence to support the allegation of recklessness was a traffic violation.

C.F.R. § 655.601–07. South Dakota has adopted the national MUTCD. SDCL 31–28–10.1 & –11. The MUTCD provides, "[w]orkers exposed to traffic should be attired in bright, highly visible clothing similar to that of flaggers." It also provides: "All traffic controls ... *shall* conform to the applicable specifications of this manual." § 6B, at 2 (emphasis added).

   Additionally, this construction contract expressly incorporates the MUTCD:
     The Contractor shall designate an employee whose only responsibility is for the maintenance of traffic. The designated person must have sufficient training and experience in the field of construction traffic control and be knowledgeable about the Manual of Uniform Traffic Control Devices (MUTCD).
     ...
     The Contractor will be required to use flaggers along repair zones where workers are close to the traffic.
   The project engineer for the State Department of Transportation, Brad Norrid, testified that the site was in compliance with the contract

guidelines and the MUTCD when he inspected it the morning of the accident. Incredibly, he also testified that he did not know whether flaggers and bright clothing were required or only recommended under the contract or the MUTCD. Also incredible was State's attempt at oral argument to justify Norrid's testimony on the basis that there was a dispute whether the use of flaggers was discretionary or mandatory. The crew foreman, Franklin Taylor, testified that flaggers were added the following week.
   However, as noted, Larson does not claim he was unaware of the construction zone because of inadequate signage or of the workers because of inadequate clothing.

3. Larson was unaware that he hit Koehn until informed by someone at the scene. Expert testimony established that his airbag deployed after impact with Smith, which may explain why he did not see Koehn. In addition, dust and debris stirred up by the air hose and Larson's vehicle may have obscured his visibility.

[¶ 20.] In *State v. Wall*, 481 N.W.2d 259, 263 (S.D.1992), a divided court affirmed a judgment of conviction for second degree manslaughter, holding that defendant's conduct leading up to the accident supported a conclusion that she was aware of, but disregarded the risk of an accident. Speaking for the majority, Justice Henderson stated:

> The evidence does rise to the level of "reckless." The State introduced evidence of the narrow width of Highway 16 in the vicinity of the collision and of the wide frame of the RV. State introduced evidence of Wall's numerous attempts to pass vehicles and of passing multiple cars in one lengthy pass. This was all done shortly after leaving the vicinity of a separate accident where traffic was slowed. This driving was all done in an obvious attempt to keep up with a traveling companion in another vehicle, who was pulling a boat at a high rate of speed. [Eyewitnesses] testified that Wall's driving came close to causing accidents over the course of several miles before she came upon Starkey's pickup. Evidence was introduced as to an excessive rate of speed that Wall was traveling and of imprudent passing of other vehicles. Witnesses testified that Wall's passing at times involved an erratic ducking in and out between cars to pass in the oncoming lane. From this evidence, other evidence in the record, and from reasonable inferences drawn therefrom, there is sufficient evidence to conclude that Wall was aware of the risk of a potential accident, yet disregarded that risk.

Likewise, there is sufficient evidence from which the jury could conclude that Larson was aware of, yet disregarded the risk of an accident. The risk of traveling at a high speed through a construction zone where the crew was visible was obvious.[4] *Cf. State v. Abbas*, 561 N.W.2d 72 (Iowa 1997) (finding evidence sufficient to support recklessness when defendant sped up to 90 m.p.h., illegally attempted to pass despite obscured visibility, and did not abort attempted passes when oncoming vehicles appeared).

[¶ 21.] The evidence is sufficient to support the jury's finding of recklessness and to support a verdict of guilt beyond a reasonable doubt.

[¶ 22.] **2. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING EXPERT AND EYE-WITNESS TESTIMONY CONCERNING TIRE TRACKS AT THE ACCIDENT SCENE.**

[¶ 23.] The trial court permitted Highway Patrolmen Storey and Koenig to testify that certain tire tracks depicted in photographs were made by Larson's vehicle. Larson argues these opinions should have been excluded as they lacked proper foundation. He further claims that State made no showing that expert testimony was required to assist the jury in making a comparison.

[¶ 24.] The two officers testified regarding the path the Explorer took through the construction zone based upon tracks left in the dust and debris in the closed lane, a tire track left on the base of a candlestick divider, blood and denim from Smith in the driving lane, and tracks in the median leading to the Explorer's stopped position.

[¶ 25.] Larson's objections to this testimony are without merit. Tracing Larson's path through the construction zone was key to

---

4. The record does not support the dissent's position that Larson was merely negligent. In fact, it shows that 1) Larson knew he was in a construction zone; 2) the first signs indicating a closed lane for construction were at least 1,500 feet before the crew's location; 3) the crew was working at the bottom of a hill; 4) a driver approaching from the west had an unobstructed view of the work area; 5) the crew was visible from 500 to 1000 feet; 6) Larson saw them and indicated that they were "kinda far out." Cf. 39 Am.Jur.2d *Highways, Streets & Bridges* § 390, at 786 (1968):

> It is proper to close one-half of a highway while it is being reconstructed and throw open the other half for use; but when this is done, the public is not thereby invited to use the open half as in all respects entirely safe and convenient, that is, as free from dangers as under ordinary conditions. The invitation has its limitations and includes warnings of danger based on physical facts apparent to the traveler.

We view the evidence in the light most favorable to the verdict, which is obviously the least favorable to Larson and supports the jury's conclusion that he was "reckless."

reconstructing the accident. Both officers were qualified as accident reconstructionists. Moreover, the trial court's rulings were consistent with our evidentiary statutes. *See* SDCL 19–15–2 (Fed.R.Evid. 702):

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*See also* SDCL 19–14–2 (Fed.R.Evid. 602):

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This section is subject to the provisions of § 19–15–3, relating to opinion testimony by expert witnesses.

■ [¶ 26.] Larson also claims that Kotz should not have been allowed to testify that the track running through his cutout was made by the Explorer. Kotz testified that he saw the vehicle go through his cutout, saw it hit the cutout in which Smith was working, and saw it strike Koehn. Based on his personal observations, he identified the track as belonging to the Explorer. The trial court's admission of this testimony comports with SDCL 19–15–1 (Fed.R.Evid. 701):

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are
>
> (1) rationally based on the perception of the witness and
>
> (2) helpful to a clear understanding of his testimony or the determination of a fact in issue.

No abuse of discretion has been shown.

[¶ 27.] **3. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING PHOTOGRAPHS OF SMITH'S AND KOEHN'S BODIES.**

■ [¶ 28.] Larson argues that the trial court abused its discretion in admitting Exhibits 1, 2, and 9. Exhibits 1 and 2 show

close-up pictures of Koehn's body and Smith's body, respectively. Exhibit 9 shows Smith's body where it came to rest in the median and was taken from the opposite direction as Exhibit 2.

[¶ 29.] State sought to admit the photographs at trial by stating:

> These photographs show ... the force of the impact on these two individuals. Specifically, Exhibit 9 is indicative that the body of Julie Smith was transported from the point of impact to its final rest in the median. And the State feels that they are proper for viewing by the jury to show what the result of the impact was.

The trial court ruled that each photograph was not unduly gruesome, more probative than prejudicial, and admissible.

[¶ 30.] Larson argues that since he acknowledged the cause of death in opening statement, it was unnecessary to admit the photographs to establish cause of death. State counters that a defendant cannot admit or stipulate away State's case, citing *State v. Knecht*, 1997 SD 53, ¶ 8, 563 N.W.2d 413, 417:

> It is well settled the State must prove every element of the charged offense beyond a reasonable doubt. Admissions or stipulations to facts by the defendant do not relieve the State of its burden of proving the necessary elements of the offense. The State is not bound by a defendant's offer to stipulate to facts in an attempt to rob the evidence of much of its fair and legitimate weight.

(Citation omitted).

■ [¶ 31.] Larson next argues that the photographs had no probative value, and even if they did, it was outweighed by their prejudicial effect. State had to prove that Larson acted recklessly. The force and impact on Smith and Koehn was demonstrated by the photographs and probative of Larson's recklessness. The photographs are not unduly gruesome. While it is particularly disturbing to see photographs of two people killed in this manner and at such a young age, that is not, standing alone, sufficient to keep them from the jury:

Photographs are admissible into evidence when they accurately portray anything which it is competent for a witness to describe in his own words, or where they are helpful as an aid to a verbal description of objects or conditions and relevant to some material issue. Photographs are not inadmissible simply due to the fact that the details of the crime are vividly brought to the jury's attention or because they incidentally tend to arouse passion or prejudice. Like any other demonstrative evidence, the admission of photographs lies within the sound discretion of the trial court.

*State v. Simons*, 313 N.W.2d 465, 468–69 (S.D.1981) (collecting cases for the proposition that this court regularly finds that pictures, slides, or X-rays were properly admitted "even if the pictures were somewhat gruesome, cumulative, or capable of arousing passion or prejudice in the jury."). Larson has not shown an abuse of discretion.

[¶ 32.] The order denying the motion for judgment of acquittal is affirmed.

[¶ 33.] MILLER, C.J., and KONENKAMP and GILBERTSON, JJ., concur.

[¶ 34.] AMUNDSON, J., dissents.

---

5. The taped conversation between Larson (BL) and Trooper Storey (TS) begins as follows:
BL (breathing/sobbing hard)
SR 41–1A go ahead
41–1A Did _____ get ahold of you yet,

---

BL (sobbing) Oh, I don't know.
TS It's 9:55 OK. . . .
BL I can't tell those guys I'm sorry . . . _____, There's nothing I can do.
TS No, there's not.
BL (a sob)
TS I need to see some identification from you.
BL (sobbing & breathing hard)
TS I need you to tell me what happened.
BL (sobbing) I was just driving . . . and he says I was speeding—I wasn't . . . I was doing sixty, officer, & I probably should have seen the sign . . . and I wasn't weaving.
TS Where did this accident . . .
BL And these guys were kinda . . . out on the . . . they were kinda far out . . . I'd have to go back. You know where the line is, they were pretty close to the line but I was in my lane.
TS Which lane are you talking about, now?
BL The left lane. I was in the left lane. And they were working, you know, on some

AMUNDSON, Justice (dissenting).

[¶ 35.] I respectfully dissent.

[¶ 36.] The majority opinion confuses "recklessness" with ordinary negligence in this case. "Recklessness" requires a "conscious and unjustifiable disregard of a substantial risk. . . ." SDCL 22–1–2(1)(d). Thus, "[r]ecklessness requires more than ordinary negligent conduct." *State v. Olsen*, 462 N.W.2d 474, 476 (S.D.1990).

[¶ 37.] The majority states that "Larson's speed of 62 to 68 m.p.h. *in the presence of a visible road construction crew* constitutes a conscious disregard of the safety of the crew." (Emphasis in original.) However, the fact that the road construction crew was visible, does not mean that Larson saw them in time to take action to avoid the accident or that he consciously disregarded the safety of the crew. The evidence showed that Larson suddenly drifted from his lane. In Larson's taped conversation with Trooper Storey almost immediately after the accident, Larson sobbed uncontrollably as he told what had happened from his perspective. He stated that "I was in my lane . . . [and the] next thing I know, I hit that gal, just boom, you know. . . . I didn't mean it, it was a total accident." He did not even know that he hit the second construction worker until after the accident had occurred.[5] "[S]omeone can-

---

squares, out by the . . . you know, the white lines, there?
TS Yeah.
BL I don't know, the next thing you know, boom. (sobbing)
BL The next thing I know, I hit that gal, just boom, you know.
TS There's a lady back here?
BL Yeah.
TS OK.
BL (sobbing) Yeah. That's the only one I heard that hit me . . . And I guess I hit that guy (slurred) too, and I ___, I didn't even know there was another guy. (sobbing)
TS OK, now your correct name is Brian David Larson, is that right?
BL (sobbing) Yes. (sobbing) . . . Oh, why does this happen to me? (sobbing) Oh, this is just hurting me. Just, never done this in my life! I didn't mean it, it was a total accident.
TS OK, now you are still at this address on your license?
BL Yes, I am.
TS OK.
BL Yeah, I haven't ___, still there. (slurred) (sobbing)

not be reckless if they are unaware of the risk their behavior creates as they cannot disregard that risk if they are unaware of it." *Olsen*, 462 N.W.2d at 476. What caused Larson to drift out of his lane is unknown, but there is no evidence in this record that showed either a pattern of erratic driving or that Larson was under the influence of alcohol or drugs.

[¶ 38.] In *Olsen*, this Court held that "the State must introduce evidence that would allow a trier of fact to conclude that Olsen was aware of the dangerous nature of his conduct." 462 N.W.2d at 477. However, the evidence showed that the defendant was not "aware of the risk he was creating when he turned his tractor towards the gravel road" and therefore his conduct did not "rise above the level of negligence." *Id.* In this case, the evidence indicates that Larson was not even aware that he was driving outside of his proper lane, so how could he be said to have consciously disregarded the danger?

[¶ 39.] *State v. Wall*, 481 N.W.2d 259 (S.D. 1992), is distinguishable because of the extensive evidence in that case of reckless driving by the defendant immediately prior to the accident. As the majority points out, *Wall* held "that defendant's conduct leading up to the accident supported a conclusion that she was aware of, but disregarded the risk of an accident." *Id.* at 263. In comparison, there is no such evidence in this case. The only culpable conscious conduct in Larson's case consisted of him choosing to drive from 5 to 13 miles per hour over the suggested speed limit, which was also well below the limit mandated by law. Furthermore, it was not the small amount by which Larson was exceeding the suggested speed limit that caused the deaths in this case—it was the fact that Larson drifted out of his proper lane of travel—an unconscious act.

[¶ 40.] *Plummer v. State*, 118 Md.App. 244, 702 A.2d 453 (1997), presented a very similar factual scenario to the case at hand. In *Plummer*, the court addressed the sufficiency of the evidence in a case where the defendant had been convicted of automobile manslaughter and reckless driving when he drove onto the shoulder of a roadway, killing a child that had been walking there with a group of friends. The *Plummer* court reversed the conviction because "[i]n all of the cases in which automobile manslaughter convictions were affirmed, the drivers of those vehicles engaged in numerous actions that could lead to a rational inference of a wanton or reckless disregard for human life." *Id.* at 464; *see, e.g., Wall*, 481 N.W.2d 259. The court summed up its decision in the following manner, the essence of which could readily apply to the case at hand:

> [A]ll of the evidence that we have in the case at bar is that the appellant momentarily drifted onto the shoulder of a road, up a sloped curve only approximately 3 inches in height, and unfortunately, took the life of a little girl. The reason for the appellant's departure from the travel portion of the roadway is and forever will be unknown. He may have dozed off at the wheel; he may have been changing the radio station; he may have been reading directions; he may have spotted something across the street that caught his attention. That he should have paid 100% attention to the roadway in front of him is without question. Nevertheless, his brief lack of attention, even though it resulted in sheer tragedy, was not of such "extraordinary or outrageous character" as to rise to the level of gross negligence capable of sustaining a conviction for automobile manslaughter.

*Id.* at 465.

[¶ 41.] Another court in addressing the case of a defendant who was shown to have driven his vehicle across the centerline and out of his lane, decided that there was "no evidence that defendant's action in driving across the center line was anything more than inadvertent carelessness or negligence." *State v. Crawford*, 471 So.2d 778, 781 (La. App.Ct.1985); *see also State v. Garrett*, 525

TS OK, Ah ...
BL (sobbing) I'll never get over this. (moaning)
TS OK, what I want you to do ... I want you just to sit tight right here in this car, OK?
BL Yeah.

TS Alright.
BL I don't know what to do, I don't want to panic but I'm really hurting.
TS You're gonna be hurting, believe me.
BL (sobbing)

So.2d 1235 (La.App.Ct.1988) (holding that leaving the roadway and striking a pedestrian on shoulder did not support criminal negligence conviction). "Evidence of carelessness, inadvertence or other similar behavior is insufficient to sustain a conviction where reckless conduct is required." *Olsen,* 462 N.W.2d at 476 (citation omitted).

[¶ 42.] The majority treats the standard of "conscious disregard" as if it were determined by an objective standard. According to this line of thinking, Larson should have been aware of the danger as he drove through the construction zone, because a reasonable person would have recognized it. However, a "conscious disregard" is a subjective standard resting on the particular defendant's state of mind. Thus, the question is whether Larson, himself, consciously disregarded a known risk of harm. The evidence does not begin to show as much. The majority grasps onto the fact that Larson knowingly drove his vehicle above the suggested speed limit (even though it was well below the actual speed limit) as evidence of Larson's recklessness. However, there is no evidence that if Larson would have been traveling at a more moderate speed that it would have prevented the tragedy that occurred. The tragedy occurred, not because of the speed of Larson's vehicle, but because he wandered, for whatever reason, out of his proper lane of travel.

[¶ 43.] In the case of *State v. Cox,* 500 N.W.2d 23 (Iowa 1993), the Iowa Supreme Court reversed a vehicular homicide conviction and held as follows:

> Here, the evidence establishes Cox failed to stop and yield as required by Iowa Code section 321.322. There was no evidence that Cox was speeding or operating his vehicle in an erratic manner. The fact that rumble strips and a "stop ahead" sign preceded the stop sign, does not elevate the stop sign violation from a simple misdemeanor to a class "C" felony.

*Id.* at 26. Likewise, the construction zone signs in this case do not elevate Larson's momentary lapse of judgment from negligence to manslaughter. In contravention to the requirement that "[r]ecklessness requires more than ordinary negligent conduct", this Court has now elevated negligence to a criminal charge. *Olsen,* 462 N.W.2d at 476. While there is obviously a good wrongful death claim here for a civil jury to address at some point, these facts do not support a manslaughter charge.

[¶ 44.] I also take issue with the majority's conclusion that it was not an abuse of discretion to allow the prosecution to admit the photographs of Smith's and Koehn's bodies. In reviewing this record, there is no explanation why the pictures were needed to prove any element of the case; they served only to evoke an emotional response to the tragic deaths of two local young people and inflame the prejudicial passions of the jury.

[¶ 45.] While photographs "are admissible into evidence 'when they accurately portray anything which it is competent for a witness to describe in his own words, or where they are helpful as an aid to a verbal description of objects or conditions' ", they must also be " *'relevant to some material issue.'* " *State v. Simons,* 313 N.W.2d 465, 469 (S.D.1981) (emphasis added) (citation omitted). The prosecutor gave the following reason to support the admittance of the photographs into evidence:

> These photographs show what the force of the impact on these two individuals [was]. Specifically, Exhibit 9 is indicative that the body of Julie Smith was transported from the point of impact to its final rest in the median. And the State feels that they are proper for viewing by the jury to show what the result of the impact was.

However, "the force of the impact" was not a material issue in the case. Furthermore, a review of this record, including the position taken by the prosecutor and the trial court, does not disclose what material issue the photographs could possibly provide probative evidence on. The photographs simply do not provide any evidentiary light on the elements of second degree manslaughter.[6]

---

6. The jury was given the following instruction as to the elements of second degree manslaughter:

1. Brian Larson committed a reckless act at the time and place alleged.

[¶ 46.] Furthermore, the potential for prejudice against Larson far outweighed any probative value. The majority claims that the pictures showed the force and impact inflicted on Smith and Koehn and were probative of Larson's recklessness. However, the majority does not explain how this is so. No testimony was offered tending to indicate the distance that Smith and Koehn were thrown by the impact with Larson's vehicle in any way related to the speed at which Larson's vehicle was traveling. Could the jury tell by looking at the photos that Larson had been driving faster than the recommended speed limit or had wandered out of his lane of travel or had consciously disregarded the risk of hitting a construction worker? Obviously not—the photos appear only to reveal that two young people died tragic deaths. "Admitting them into evidence served no purpose other than to inflame the jury." *Thompson v. State,* 724 P.2d 780, 782 (Okla. Crim.App.1986) *modified on other grounds, Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988). As the court stated in *Thompson,* "We fail to see how [these photographs] could possibly assist the jury in the determination of defendant's guilt. The trial court's admission of these [ ] photographs was error." 724 P.2d at 782–83 (citation omitted).

[¶ 47.] The motivation of the prosecutor in this case to introduce the photographs is explained by the weakness of the case against Larson. Without the passion aroused by the pictures, the jury may have acquitted Larson. As evidence of the closeness of the decision, I point to the following jury communications with the trial court:

Question 1, 2–26–97, 6 p.m.: "Are there further examples or more detail in distinguishing the difference between reckless and negligent?"

Judge's Response: "No."

2. The reckless act caused the death of [the construction workers].
The jury also received the definition of "reckless" in the instruction that follows:
The words 'reckless' or 'recklessly' mean a conscious and unjustifiable disregard of a substantial risk that a person's conduct may cause a certain result or may be of a certain nature.

Question 2, 2–27–97, 3:22 p.m.: "We cannot agree; we are at a stalemate. Any advice?"
Judge's Response: "Deliberate some more."
Question 3, 2–27–97, 3:42 p.m.: "Please define or explain 'conscious disregard.'"
Judge's Response: "Answer to Question 3: 'Conscious disregard' means a person is aware of, and unjustifiably disregards, a substantial risk."
Question 4, 2–27–97, 5:12 p.m.: To clarify our previous statement, we remain deadlocked with virtually the same results as last night.

[¶ 48.] If Larson's conviction is to stand, it should not be on the basis of highly inflammatory photographs with little probative value. A defendant in a criminal trial is not entitled to a perfect trial, but is entitled to a fair trial. *State v. Raymond,* 540 N.W.2d 407, 410 (S.D.1995) (citations omitted). The admission of these photographs certainly did not provide the fair trial that was Larson's right.

A person is reckless when the person consciously and unjustifiably disregards a substantial risk.
Careless, inadvertent or thoughtless omission is not reckless. Violation of a traffic law, without more, is not reckless even if a fatality results.